David Lawton (CA Bar No. 275435)
THE GALLAGHER LAW GROUP PC
1875 Century Park East, Suite 1550
Los Angeles, CA 90067
Telephone: (310) 203-2600
Facsimile: (310) 203-2610
E-mail: dlawton@thegallaghergroup.com

Attorney for Plaintiff Frank S. Cammarata d/b/a Cammarata Associates, as successor to MHP II Corporation

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

FRANK S. CAMMARATA, d/b/a CAMMARATA ASSOCIATES, as successor to MHP II Corporation.

Plaintiff,

v.

KELLY CAPITAL, LLC, KELLY ESCROW FUND V, LLC and MICHAEL R. KELLY,

Defendants.

Case No. '17CV346 BEN AGS

PLAINTIFFS' COMPLAINT FOR:

1. FRAUDULENT CONCEALMENT
2. INTENTIONAL MISREPRESENTATION
3. NEGLIGENT MISREPRESENTATION
4. BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE
5. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
6. RESCISSION OF CONTRACT
7. BREACH OF CONTRACT
8. DECLARATORY RELIEF
9. DECLARATORY RELIEF
10. QUANTUM MERUIT

## I. INTRODUCTION

1. Plaintiff Frank S. Cammarata ("Cammarata") doing business as Cammarata Associates, as successor to MHP II Corporation (hereinafter collectively referred to as "Plaintiffs"), as against Kelly Capital, LLC ("Kelly Capital"), Kelly Escrow Fund V, LLC ("Kelly Escrow") and Michael R. Kelly, alleges as follows:

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, et seq., as the matter involves a dispute between citizens of different states and the amount in controversy exceeds $75,000.

3. Venue is proper in this Court under 28 U.S.C. § 1391 (b) because at least one of the defendant's principal place of business is in this district.

4. This Court may issue a declaratory judgment in this case pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## III. PARTIES

5. Frank S. Cammarata is an individual and sole proprietor doing business as Cammarata Associates. Frank S. Cammarata is a citizen of the State of New Jersey and is domiciled at 926 Kings Croft, Cherry Hill, New Jersey 08034.

6. Cammarata Associates' principal place of business is 525 Route 73 North, Marlton, New Jersey 08053. Cammarata Associates' predecessor, MHP II Corporation ("MHP II"), was a New Jersey corporation with a principal place of business at 525 Route 73 North, Marlton, New Jersey 08053. Frank S. Cammarata was the sole shareholder of MHP II during its existence. Cammarata Associates acquired MHP II by assignment on January 1, 2014.

7. Upon information and belief, Michael R. Kelly is a citizen of, and domiciled in, the State of California, with a mailing address at P.O. Box 1967 Rancho Santa Fe, California 92067.

8. Upon information and belief, based on records with the State of California, Kelly Capital, LLC is a California limited liability company with a principal place of business at 12730 High Bluff Drive, Suite 250, San Diego, California 92130, managed by Michael R. Kelly.

9. Upon information and belief, based on records with the State of California, the sole member of Kelly Capital is Michael R. Kelly. Kelly Capital and Michael R. Kelly are collectively referred to herein as "Kelly".

10. At all times relevant herein, on information and belief, Kelly Escrow, was a California limited liability company with a principal place of business at 225 Broadway, 18th Floor, San Diego, California, and was managed by Emmett David Hart, Jr.

11. Kelly and Kelly Escrow are collectively referred to herein as "Defendants".

## IV. ALLEGATIONS

### A. Background On Escrow Accounts and Escrow Releases

12. In the 1990's, several states initiated class actions against tobacco manufacturers seeking compensation for expenses incurred, or to be incurred, in treating diseases associated with smoking tobacco. Those actions were settled pursuant to a 1998 Master Settlement Agreement ("MSA"). However, not all tobacco companies were parties to the class actions or the MSA; and, to bring the non-signing manufacturers into the fold and achieve the same result as the MSA, states passed legislation.

13. As a result of the MSA or the state legislation, tobacco manufacturers in Virginia and 45 other states are required either to have signed the MSA or to contribute annually to an escrow account certain sums for each carton of cigarettes sold. The deposited funds must remain in escrow for 25 years. While in escrow, those funds may be used only to pay judgments on, or settlements of, tobacco-related claims. At the end of 25 years, the depositing company is entitled to the deposited funds then remaining in the escrow account, *i.e.,* the portion of the principal that has not been used to pay judgments on, or settlements of, tobacco-related claims. The deposited funds may be invested, under tightly regulated

circumstances, in very restricted investment vehicles that produce interest income. In essence, the deposited funds earn interest and the depositing company is entitled to that interest, as it is earned.

14. S& M Brands, Inc. ("S&M") is a tobacco manufacturer and distributor of cigarettes and other tobacco products throughout the Eastern United States, with its principal place of business in Keysville, Virginia. S&M is not a party to this lawsuit.

15. S&M did not sign the MSA, and thus, as required by state laws, it established escrow accounts in each state in which it sold cigarettes. The escrow accounts are governed by an Escrow Agreement between S&M and a national banking association (the "Escrow Agent"). S&M has a separate escrow account for each year in which it has sold cigarettes and thereafter funded the escrow accounts.

16. The tobacco companies that establish, and fund, these escrow accounts cannot sell, transfer, distribute, or use the principal funds deposited in the accounts until expiration of the 25–year period. However, they can sell or distribute "escrow releases." An escrow release, *inter alia,* vests in the purchasing entity: (1) the right to the interest income earned from the funds that have been deposited into the escrow accounts; and (2) the right to receive any funds, principal or interest that remain in the escrow account at the end of the 25–year period.

17. Tobacco companies that were signatories to the MSA were able to

take tax deductions for their contributions to the escrow accounts because those accounts were designated as Qualified Settlement Funds ("QSF").

18. Tobacco companies that were not signatories to the MSA, and who created their own escrow accounts, were not entitled to the benefit of the QSF deduction.

**B. Beginning of the Relationship Between Defendants and Plaintiffs**

19. In 2009, S&M had escrow releases available for purchase from the years 1999-2009, in the amount of $182,491,650.00.

20. S&M asked Cammarata to help locate purchasers for their escrow releases. Cammarata reached out to Kelly, a private equity venture that acquired and managed asset-based businesses, real estate debt and other investments.

21. Cammarata formed MHP II for the purpose of assisting Kelly with its efforts to purchase tobacco escrow releases.

**C. The Agreement Between Defendants and MHP II**

22. On April 12, 2010, Kelly and MHP II entered into a written Commission Agreement. *See Attachment A to Complaint.*

23. Pursuant to the Commission Agreement MHP II agreed to introduce Kelly to S&M, and Kelly agreed that "upon close of any escrow relating solely to the Escrow Funds by the Company", to pay MHP II a commission of five percent (5%) of the gross purchase price paid by Defendants to S&M for the subject

escrow releases. *Attch. A,* ¶*3*.

24. MHP II did everything that it was required to do pursuant to the Commission Agreement including introducing Defendants to S&M.

25. As a result of MHP II's performance under the Commission Agreement, Kelly entered into negotiations with S&M to purchase the escrow releases.

26. On April 16, 2010, Kelly purchased $30 million of S&M escrow releases through its assignee, SEI, for a purchase price of $10 million. ("Purchase 1")

27. Pursuant to the Commission Agreement, Kelly paid MHP II $500,000 representing 5% commission for Purchase 1.

28. On July 15, 2010 Kelly assigned the remainder of its rights to purchase escrow releases to Kelly Escrow.

29. On that same day, July 15, 2010, Kelly Escrow purchased $40 million of escrow releases for a purchase price of $13,600,000. ("Purchase 2")

30. As a result of Purchase 2, Kelly was obligated to pay Plaintiffs $680,000.00 pursuant to the Commission Agreement upon the close of escrow.

31. Thereafter, Kelly on behalf of the Defendants, called Frank S. Cammarata and informed Plaintiffs that it had to "warehouse" the $40 million in escrow releases it had just purchased from S&M, and asked Plaintiffs to agree to

wait for payment of its commission until it could free up the escrow releases for disposition - a process that Defendants orally represented to Plaintiffs would take 60-90 days.

32. In reliance on that representation from Defendants, Plaintiffs agreed to grant the Defendants' request, and executed a written First Amendment To Commission Agreement ("Amendment") prepared solely by the Defendants. *See Attachment B to the Complaint.* The undated Amendment was made "effective" on July 15, 2010.

33. The Amendment acknowledged that Kelly had assigned its interest in the Escrow Release Transfer Agreement ("ERTA") with S&M to an "affiliated entity" of Kelly, and that Kelly remained contractually obligated to pay MHP II its commission pursuant to the terms of the original Commission Agreement.

34. Additionally, the Amendment stated that said commission was payable at the time the escrow releases were sold, conveyed and/or transferred to a "third-party end user and/or financial institution". The terms/phrase "third-party end user and/or financial institution" inserted by the Defendants was not defined.

35. Defendants have failed or refused to pay Plaintiffs commission due and owed as a result of Purchase 2, in the amount of $680.000.00.

**D. <u>Facts Established As A Matter Of Law</u>**

36. The Defendants filed suit against S&M in the United States District

Court for the Eastern District of Virginia in October 2010.

37. After a bench trial before the Honorable Robert E. Payne, Senior Judge, U.S. District Court for the Eastern District of Virginia, the Court made findings of fact and ruled against the Defendants. *Kelly Capital LLC v. S&M Bands, Inc.,* 873 F.Supp.2d 659 (E.D. VA 2012).

38. On appeal, the United States Court of Appeals for the Fourth Circuit affirmed the ruling of the District Court. *Kelly Capital LLC v. S&M Bands, Inc.,* 532 F. App'x 422 (4th Cir. 2013).

39. The following findings of fact made by U.S. District Court for the Eastern District of Virginia are conclusive as against Defendants as a matter of law.

40. "Mr. Cammarata set up a conference call on January 7, 2010 between Kelly and the leadership at S&M." *Kelly Capital LLC v. S&M Bands, Inc.*, 873 F.Supp.2d 659, 665.

41. Kelly and S&M conducted "as many as 30 conference calls in January, February, and March." *Id.*

42. "S&M informed Kelly, early in the negotiations, about the QSF-status of the escrow releases and about the double-layer of taxation." *Id.*

43. "Mr. Kelly responded to that advice by relating that 'he intended to put [the to-be-purchased] escrow [releases] into a pension fund that was associated

with a company that Kelly Capital owned [SEI] ... and he wasn't concerned with two levels of taxation inasmuch as the pension fund avoided the second level of taxation'." *Id.*

44. "That approach was abandoned, however, when Kelly learned that a pension fund could not prudently own the quantum of escrow releases that Kelly had decided to buy from S&M." *Id.*

45. "When that circumstance became known to Kelly, the configuration of the transaction changed. Mr. Kelly then decided that the pension fund would purchase the quantum of releases that it could prudently hold in its portfolio, and Kelly would then purchase the quantum that the pension fund could not buy with a view to immediately reselling, or "flipping" them to third-parties." *Id.*

46. "Having determined that the pension fund could purchase a limited quantity of the S&M escrow releases, but desirous of purchasing a greater quantity than that, it thus became necessary to find a way that Kelly could avoid the QSF-level tax." *Id.*at 666.

47. "Mr. Kelly had settled, by then, on the theory that, because S&M would pay taxes on its income from the sale of its escrow releases and because Kelly would thereafter own all "income" generated by the escrowed funds, the Q SF-status of the funds (and hence the QSF-level taxes) would be eliminated upon the completion of its transaction with S&M." *Id.*

48. Kelly retained the law firm of Brown Rudnick to research his theory on eliminating the QSF-level taxes. "The lawyers at Brown Rudnick told Mr. Kelly that his theory likely would not work." *Id.*

49. "Thus, early in the negotiations, Mr. Kelly clearly understood that his theory about eliminating the QSF-level taxes might not be viable." *Id.*

50. "On April 16, 2010, Kelly Capital assigned its immediate rights to purchase escrow releases to SEI, and SEI purchased $30 million of escrow releases for a purchase price of $10 million." *Id.*at 668.

51. "On July 15, 2010, Kelly Capital assigned the remainder of its rights to purchase escrow releases to Kelly Escrow, and Kelly Escrow purchased $40 million of escrow releases for a purchase price of $13.6 million." *Id.*

52. "Kelly and SEI then sought to resell the escrow releases to investors or to "securitize" them. However, Kelly and SEI learned that, in order to do so, they had to disclose the risk that the purchasers would be responsible for the QSF-level tax." *Id.*

53. "On September 28, 2010 S&M informed Kelly that it would not extend the options period unless Kelly first provided written assurance that it would perform under the ERTA by paying the QSF-level taxes." *Id.* at 669.

54. "By telling S&M that it would not pay the QSF-level taxes, Kelly committed an anticipatory breach." *Id.* at 678

55. “Kelly knowingly accepted the risk that Mr. Kelly’s theory might not be a viable one, and it knew that, if Mr. Kelly’s theory was incorrect, Kelly, not S&M, would be responsible to pay the QSF-level taxes.” *Id.* at 674

56. “In trying to securitize the escrow releases, Kelly came to the realization that it would have to disclose the QSF-level tax burden, Mr. Kelly's theory, and the flaws inherent in that theory to potential investors.” *Id.* at 675.

57. “If Kelly had believed that S&M was obligated by the ERTA to pay the QSF-level taxes, it simply could have so said in its disclosure to investors. But, Kelly knew that it could not make such a statement because it knew well that the ERTA did not impose that obligation on S&M. To the contrary, as is shown by the text of the ERTA and the drafting history, Kelly knew that S&M had refused to accept that obligation, but had agreed to contract language that Mr. Kelly believed would allow Kelly to pursue his theory with the IRS.” *Id.*

**COUNT I**
**FRAUDULENT CONCEALMENT**

58. Plaintiffs re-allege and incorporate by reference Paragraphs 1-57 set forth above in this Complaint as if set forth herein.

59. At the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Defendants had been informed by S&M, that S&M had previously obtained a private letter ruling from the Internal Revenue Service whereby deposits into the escrow accounts were

designated as QSF and were tax deductible by S&M, but that interest earned on the deposited principal funds designated as QSF was subject to the double layer of taxation.

60. Additionally, at the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Kelly had settled on his theory that he could avoid the double taxation because S&M would pay taxes on its income from the sale of its escrow releases.

61. Additionally, at the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Defendants' lawyers at Brown Rudnick had told Kelly that his theory to avoid double taxation likely would not work, and that Defendants clearly understood that Kelly's theory about eliminating the QSF-level taxes might not be viable.

62. Additionally, at the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Defendants were knowingly accepting the risk that Kelly's theory might not be a viable one, and failed to inform Plaintiffs that Defendants knew that, if Kelly's theory was incorrect, Defendants, not S&M, would be responsible to pay the QSF-level taxes.

63. Additionally, at the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Defendants knew that it would have to disclose the QSF-level tax burden, which would negatively affect

Defendants' ability to obtain potential investors, or to flip or resell the Escrow Accounts, because the purchasers/investors would be responsible for the QSF-level tax.

64. Additionally, at the time that Defendants and Plaintiffs entered into the Amendment, Defendants failed to inform Plaintiffs that Kelly knew that it could not tell investors that S&M was obligated by the ERTA to pay the QSF-level taxes because Kelly knew that S&M had refused to accept that obligation.

65. At the time that Defendants and Plaintiffs entered into the Amendment, Defendants knew that its ability to sell, convey and/or transfer the escrow releases was greatly impaired, or not viable, because of the QSF-Level Tax Burden.

66. At the time that Defendants and Plaintiffs entered into the Amendment, Plaintiffs did not know of the facts set forth herein, which were concealed by Defendants.

67. At the time that Defendants and Plaintiffs entered into the Amendment, Defendants intended to deceive Plaintiffs by concealing the facts set forth herein.

68. Each concealed fact is material to the contract, affecting Plaintiffs' ability to receive payment, and a substantial factor in causing Plaintiffs' harm.

69. Had the concealed facts, or any fact set forth herein, been disclosed to

Plaintiffs, Plaintiffs would not have entered into the Amendment.

70. As a direct and proximate result of Defendants' concealment, Plaintiffs have been economically harmed.

71. Defendants' actions described above were willful, wanton and malicious in that Defendants intended to cause injury to Plaintiffs by enticing Plaintiffs to enter into the Amendment while concealing facts which, had they been known to Plaintiffs, Plaintiffs would not have entered into the Amendment. Such actions of Defendants were done in willful disregard for the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

## COUNT II
## INTENTIONAL MISREPRESENTATION

72. Plaintiffs re-allege and incorporate by reference Paragraphs 1-71 set forth above in this Complaint as if set forth herein.

73. Defendants represented to Plaintiffs that Defendants would sell, convey and/or transfer the escrow releases to a third-party, and pay Plaintiffs commission due and owing under the Commission Agreement, within 60-90 days of July 15, 2010.

74. At the time Defendants made such representations, Defendants knew that the representations were false, or made the representations recklessly and without regard for the truth.

75. Defendants intended that Plaintiffs would rely on the representations

in entering the Amendment, and Plaintiffs did reasonably rely on Defendants' representations.

76. As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have been economically harmed.

77. Plaintiffs' reliance on Defendants' representation was a substantial factor in causing Plaintiffs' harm.

78. Defendants' actions described above were willful, wanton and malicious in that Defendants intended to cause injury to Plaintiffs by enticing Plaintiffs to enter into the Amendment while misrepresenting facts which, had they been known to Plaintiffs, Plaintiffs would not have entered into the Amendment. Such actions of Defendants were done in willful disregard for the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**

79. Plaintiffs re-allege and incorporate by reference Paragraphs 1-78 set forth above in this Complaint as if set forth herein.

80. Defendants represented to Plaintiffs that Defendants would sell, convey and/or transfer the escrow releases to a third-party, and pay Plaintiffs commission due and owing under the Commission Agreement, within 60-90 days of July 15, 2010.

81. Defendants' representation was not true.

82. At the time Defendants made the representation, Defendant knew, or should have known, that it was false, or if Defendants believed the representation to be true, had no reasonable ground for such belief.

83. Defendants intended that Plaintiffs would rely on the representations in entering the Amendment, and Plaintiffs did reasonably rely on Defendants' representations.

84. As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have been economically harmed.

85. Plaintiffs' reliance on Defendants' representation was a substantial factor in causing Plaintiffs' harm.

**COUNT IV**
**BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE**

86. Plaintiffs re-allege and incorporate by reference Paragraphs 1-85 set forth above in this Complaint as if set forth herein.

87. Plaintiffs entered into the Commission Agreement and the Amendment with Defendants.

88. Plaintiffs did all, or substantially all of the significant things required under those agreements as required.

89. Defendants were required to pay Plaintiffs commission upon the close of escrow for Defendants' purchase, transfer and conveyance of Escrow Funds

from S&M.

90. Defendants did not pay Plaintiffs commission due and owing upon the close of escrow, based on the purchase, transfer and conveyance of Escrow Funds from S&M.

91. Defendants failed to use reasonable care when Defendants assigned its rights to purchase escrow releases to Kelly Escrow.

92. As a direct and proximate result of Defendants' failure to perform with reasonable care under agreements with Plaintiffs, Plaintiffs have been economically harmed.

**COUNT V**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

93. Plaintiffs re-allege and incorporate by reference Paragraphs 1-92 set forth above in this Complaint as if set forth herein.

94. Plaintiffs entered into the Commission Agreement and the Amendment with Defendants.

95. Plaintiffs did all, or substantially all of the significant things required under those agreements as required.

96. All conditions required for Plaintiffs performance has occurred.

97. Defendants unfairly interfered with the rights of Plaintiffs to receive the benefits of the agreements.

98. Plaintiffs have been harmed by Defendants' conduct.

**COUNT VI**
**RESCISSION OF CONTRACT**

99. Plaintiffs re-allege and incorporate by Paragraphs 1-98 set forth above in this Complaint as if set forth herein.

100. Effective July 15, 2010, Plaintiffs and Defendants purportedly entered into the written Amendment, which contended to amend the original written Commission Agreement.

101. Prior to purportedly entering into the written Amendment, Plaintiffs had already fully performed as required by the Commission Agreement, and had no further obligations to perform under the Commission Agreement.

102. Prior to purportedly entering into the written Amendment, Defendants had a then preexisting duty to pay Plaintiffs commission due and owed as a result of Purchase 2 which was not doubtful or excused by operation of law.

103. At the time that Plaintiffs and Defendants purportedly entered into the Amendment, Defendants made representations to Plaintiffs, which Plaintiffs did not know were false, but believed them to be true and reasonably relied on them, and/or concealed facts known by Defendants which were material to the agreement. Had Plaintiffs known the true facts, they would not have executed the Amendment and would not have agreed to Defendants' substitute performance.

104. As a result of Plaintiffs' full performance under the Commission Agreement, and Defendants' preexisting duty under same, no consideration was

provided by Defendants for the Amendment.

105. Additionally, the Amendment constitutes and unconscionable contract of adhesion whereby the risk that Plaintiff would not timely be paid commission due under the Commission Agreement was not disclosed to Plaintiffs, while Defendants, with superior knowledge and bargaining power, obtained Plaintiffs' consent through fraudulent concealment, intentional misrepresentation, or negligent misrepresentation.

106. Plaintiffs will suffer substantial harm and injury under the Amendment if it is not rescinded, in that Defendants will not timely pay commission due and owed under the Commission Agreement as expected by Plaintiffs.

107. Plaintiffs assert the right to rescind the Amendment under California Civil Code §§1688, et. seq.

108. Plaintiffs intend that service of the summons and complaint in this action shall serve as notice of rescission of the Amendment and hereby offers to restore the Commission Agreement effective on the date of service of the summons and complaint.

**COUNT VII**
**BREACH OF CONTRACT**

109. Plaintiffs re-allege and incorporate by reference Paragraphs 1-108 set forth above in this Complaint as if set forth herein.

110. The Commission Agreement and Amendment executed by Defendants and Plaintiffs constitutes a binding and enforceable contract.

111. Plaintiffs fully performed all that was required under the Commission Agreement and Amendment by providing the services required therein.

112. Defendants have breached the Commission Agreement and the Amendment by failing to pay Plaintiffs commission due and owing for Purchase 2.

113. As a direct and proximate result of Defendants' breach, Plaintiffs have been damaged economically.

**COUNT VIII**
**DECLARATORY RELIEF**
**(Terms of the Agreements)**

114. Plaintiffs re-allege and incorporate by reference Paragraphs 1-113 set forth above in this Complaint as if set forth herein.

115. An actual controversy now exists between Plaintiffs and Defendants under the Commission Agreement and the Amendment, in that Defendants contend, and Plaintiffs deny, that Kelly Escrow or the current owner of the escrow releases which were sold and transferred by S&M, is not a "third-party end user and/or financial institution".

116. Plaintiffs desire a judicial determination that Kelly Escrow, its assignee, or the current owner of the escrow releases, and/or the owner of income generated by the escrowed funds, is a "third-party end user and/or financial

institution” as that term is used in the Amendment.

117. Declaratory relief is necessary and proper at this time so that Plaintiffs and Defendants may obtain a determination on the construction of the terms of the Commission Agreement and Amendment, and their respective rights, duties, and obligations thereunder in accordance with California’s declaratory relief statute and/or the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

118. Because a declaration as to the parties’ rights duties, and obligations under the terms of the Commission Agreement and Amendment is necessary and proper at this time and is within the Court’s jurisdiction, Plaintiffs seeks a declaration that Defendants are obligated to pay commission to Plaintiffs forthwith.

**COUNT IX**
**DECLARATORY RELIEF**
**(Uncertain Conditions)**

119. Plaintiffs re-allege and incorporate by reference Paragraphs 1-118 set forth above in this Complaint as if set forth herein.

120. An actual controversy now exists between Plaintiffs and Defendants under the Commission Agreement and the Amendment in that Defendants contend, and Plaintiffs denies, that Defendant has no obligation to pay Plaintiffs commission until some unknown time in the future, irrespective of the fact that Defendants, or their assignee, has paid S&M, and S&M has transferred the Escrow Releases to Defendants or their assignee.

121. Declaratory relief is necessary and proper at this time so that Plaintiffs and Defendants may obtain a determination on the construction of the Commission Agreement and Amendment, and their respective rights, duties, and obligations thereunder in accordance with California's declaratory relief statute and/or the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

122. Because a declaration as to the parties' rights duties, and obligations under the Commission Agreement and Amendment is necessary and proper at this time and is within the Court's jurisdiction, Plaintiffs seeks a declaration that Defendants are obligated to pay commission to Plaintiffs forthwith.

**COUNT X**
**QUANTUM MERUIT**

123. Plaintiffs re-allege and incorporate by reference Paragraphs 1-122 set forth above in this Complaint as if set forth herein.

124. Plaintiffs conferred a benefit upon Defendants by providing introductory services with S&M to purchase tobacco escrow release funds.

125. Plaintiffs did not receive value in return for conferring that benefit to Defendants.

126. Allowing Defendants to gain from that conferred benefit without paying Plaintiffs the value of those services lost would be unjust.

127. Plaintiffs are entitled to the fair value of the service provided which conferred the subject benefit to Defendants.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully request that this Court:

A. Award Plaintiff compensatory damages;

B. Award direct, indirect, consequential general, and special damages according to proof;

C. Award exemplary and punitive damages;

D. Award pre-judgment interest and costs of suit,

E. Award costs of suit and reasonable attorneys' fees;

F. Award an order of rescission of the Amendment;

G. Make a judicial determination that Kelly Escrow, its assignee, or the current owner of the escrow releases, and/or the owner of income generated by the escrowed funds, is a "third-party end user and/or financial institution";

H. Make a judicial determination of the construction of the Commission Agreement and Amendment, and their respective rights, duties, and obligations thereunder;

I. Award any other relief that the Court deems just and proper.

Respectfully submitted,

Dated: February 21, 2017

s/ David H. Lawton ___________ _____
Attorney for Plaintiffs
dlawton@thegallaghergroup.com